# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **RICKY L. WARD,** )  | | |
| Plaintiff ) | | |
| ) | | |
| v. ) | Civil Action No. 2:05cv00060 | |
| ) | **MEMORANDUM OPINION** | |
| ) | | |
| ) | | |
| **JO ANNE B. BARNHART**, ) | | |
| **Commissioner of Social Security,** ) | By: PAMELA MEADE SARGENT | |
| Defendant ) | United States Magistrate Judge | |

In this social security case, I affirm the final decision of the Commissioner denying benefits.

*I. Background and Standard of Review*

Plaintiff, Ricky L. Ward, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying plaintiff's claims for supplemental security income, ("SSI"), and disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 and § 1381 *et seq.* (West 2003 & Supp. 2006). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge upon transfer pursuant to the consent of the parties under 28 U.S.C. § 636(c)(1).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through

-1-

application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Ward filed his applications for DIB and SSI on or about October 9, 2003, alleging disability as of December 31, 2001,[1] based on various musculoskeletal impairments, anxiety and depression. (Record, ("R."), at 54-56, 65, 109, 449-51, 478.) Ward's claims were denied both initially and on reconsideration. (R. at 32-34, 37, 38-40, 453-55, 460-62.) Ward then requested a hearing before an administrative law judge, ("ALJ"). (R. at 41.) The ALJ held a hearing on May 9, 2005, at which Ward was represented by counsel. (R. at 471-514.)

By decision dated July 21, 2005, the ALJ denied Ward's claims. (R. at 15-23.) The ALJ found that Ward met the disability insured status requirements of the Act for DIB purposes through December 31, 2003. (R. at 22.) The ALJ found that Ward had not engaged in substantial gainful activity since December 31, 2001. (R. at 22.) The ALJ found that the medical evidence established that Ward had severe impairments, namely musculoskeletal impairments, Hepatitis C, alcohol abuse and possible

---

[1] Ward initially alleged a disability date of December 31, 2000, however, he amended his applications at his hearing to indicate a disability date of December 31, 2001. (R. at 54, 477-78.)

borderline intellect, but he found that Ward did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 22.) The ALJ further found that Ward's allegations regarding his limitations were not totally credible. (R. at 22.) The ALJ found that Ward had the residual functional capacity to perform simple, unskilled medium work,[2] except food service jobs, that did not require the performance of more than occasional bending, stooping or squatting. (R. at 22.) The ALJ found that Ward could perform his past relevant work. (R. at 22.) Therefore, the ALJ found that Ward was not under a disability as defined in the Act, and that he was not eligible for benefits. (R. at 22-23.) *See* 20 C.F.R. §§ 404.1520(f), 416.920(f) (2006).

After the ALJ issued his opinion, Ward pursued his administrative appeals, (R. at 11), but the Appeals Council denied his request for review. (R. at 7-10.) Ward then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2006). The case is before this court on Ward's motion for summary judgment filed April 21, 2006, and the Commissioner's motion for summary judgment filed May 17, 2006.

## *II. Facts*

Ward was born in 1955, (R. at 54), which classifies him as a "person closely approaching advanced age" under 20 C.F.R. §§ 404.1563(d), 416.963(d). He has a high school education and vocational educational training in auto body repair. (R. at

---

[2]Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If an individual can do medium work, he also can do sedentary and light work. *See* 20 C.F.R. §§ 404.1567(c), 416.967(c) (2006).

71.) Ward has past relevant work experience as a general construction laborer. (R. at 66, 84.)

Ward testified at this hearing that he was hit in the head with a baseball bat in 1992. (R. at 481.) He stated that as a result of this injury he had difficulty remembering. (R. at 487.) He stated that he could stand or walk for 15 to 30 minutes without interruption. (R. at 482.) He stated that he could sit for up to 30 minutes without interruption. (R. at 483.)

Dr. Karen Tootle, M.D., a medical expert, testified at Ward's hearing. (R. at 493-96.) Dr. Tootler stated that Ward did not have any significant physical limitations. (R. at 493.) She stated that the record was void of any symptoms based on Ward's diagnosis of Hepatitis C. (R. at 494.) Dr. Tootle stated that unless Hepatitis C is in the advanced stages with liver dysfunction, it would be asymptomatic. (R. at 494.) She stated that the limitations placed on Ward's ability to balance, stoop, kneel, crouch and crawl were not unreasonable. (R. at 495-96, 509.)

Thomas Schacht, Psy.D., a medical expert, testified at Ward's hearing. (R. at 496-504.) Schacht testified that Ward's primary psychological impairment was alcohol dependence. (R. at 496.) He stated that a review of Ward's school records indicated that Ward was not mentally retarded. (R. at 499-500.) Schacht stated that Ward had an above average intelligence before he started consuming alcohol. (R. at 501.)

Robert Spangler, a vocational expert, also was present and testified at Ward's

hearing. (R. at 505-12.) Spangler was asked to consider a hypothetical individual of Ward's age, education and work experience, who was limited to medium work with limitations on reaching with his left arm and postural limitations such as bending and stooping. (R. at 505-06.) Spangler testified that such an individual could perform jobs such as a cashier, a postal mail carrier, an inventory clerk, a private household cleaner, a kitchen worker, a miscellaneous food preparer, a janitor, a childcare worker and a nonconstruction laborer. (R. at 506, 509-10.)

In rendering his decision, the ALJ reviewed records from Wise County Public Schools; Indian Path Hospital; Lonesome Pine Hospital; Central Appalachia Services, Inc.; Norton Community Hospital; Dr. Frank M. Johnson, M.D., a state agency physician; Dr. Kevin Blackwell, D.O.; R. J. Milan Jr., Ph.D., a state agency psychologist; Dr. Danny A. Mullins, M.D.; Dr. Jill Couch, D.O.; B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist; The Laurels; and Cabarrus Memorial Hospital.

Records from Wise County Public Schools show that Ward had a full-scale IQ score of 111. (R. at 128.)

The record shows that Ward underwent surgery on March 18, 1993, at Cabarrus Memorial Hospital to repair a right knee medial meniscus tear. (R. at 442-47.)

On May 10, 1992, Ward was seen at the emergency room at Lonesome Pine Hospital after being hit over the head with a hard instrument. (R. at 142-45.) His neurological exam was normal. (R. at 143.) Ward had a strong smell of alcohol about him and his alcohol level on admission was .369. (R. at 143-44.) Examination of

Ward's neck was unremarkable. (R. at 143.) He had minimal tenderness over the thoracic spine, and his lumbar spine was normal. (R. at 143.) A CT scan of Ward's brain, skull and cervical spine were unremarkable. (R. at 144.) He was diagnosed with a blunt head trauma with cerebral concussion. (R. at 144.) On April 1, 1998, Ward was seen at the emergency room and was diagnosed with alcohol intoxication. (R. at 176.) On April 13, 1998, Ward was seen at the emergency room and was diagnosed with alcohol intoxication and multiple lacerations. (R. at 172-75.) On November 13, 2002, Ward presented to the emergency room for complaints of right foot and leg pain, left shoulder and left hip pain. (R. at 298-99.) X-rays of Ward's left shoulder showed a fracture. (R. at 300.) X-rays of Ward's right lower leg showed post operative changes of the distal fibula. (R. at 300.) X-rays of Ward's left hip and pelvis showed no fracture. (R. at 300-01.) X-rays of Ward's right foot were normal. (R. at 301.) On March 6, 2003, Ward presented to the emergency room for treatment of fractures to his left hand. (R. at 302-05.)

Ward received services from Central Appalachia Services, Inc., and Wise County Behavioral Health Services from March 1998 through April 2004 for alcohol dependence.[3] (R. at 153-66, 210-90.) In February 1999, Ward's counselor reported that he did not believe that Ward was concerned about his drinking problem or other aspects of his life. (R. at 155.) He reported that he believed Ward was attempting to manipulate to lessen the impact of his actions. (R. at 155.) In March 1999, Ward had no health or psychiatric complaints. (R. at 154.) On January 15, 2002, Ward reported that he was working in construction. (R. at 377.) On January 22, 2002, Ward again reported that he was working regularly. (R. at 376.) It was reported that Ward's

---

[3]Ward was court-ordered to attend these sessions.

appearance, mood, behavior, cognition and affect all appeared to be within normal limits. (R. at 376.) In August 2003, Ward reported that he had lost his driver's license several years previously and that although he had the ability to retain a driver's license, he chose not to do so because he loved to drink. (R. at 270.) In September 2003, it was indicated that Ward had a Global Assessment of Functioning, ("GAF"), score of 50.[4] (R. at 259.)

Ward first complained of anxiety on December 15, 2003. (R. at 243.) He reported sobriety; however, Rebekah Cardena, M.S., reported that she did not believe that Ward had reduced his alcohol consumption. (R. at 242-43.) On January 2, 2004, Dr. Randall Pitone, M.D., a psychiatrist, saw Ward for his complaints of anxiety, panic attacks and insomnia. (R. at 239-40.) He reported that he had been sober for three months. (R. at 239.) Dr. Pitone reported that Ward's mood was moderately anxious. (R. at 239.) Dr. Pitone diagnosed alcohol dependence in early sustained remission and anxiety disorder, not otherwise specified. (R. at 240.) He assessed a GAF score of 50-55.[5] (R. at 240.)

On January 5, 2004, Ward reported to Sarah Talley, B.S., that he had been sober for one month. (R. at 238.) He reported that the medication prescribed by Dr. Pitone

---

[4]The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994). A GAF of 41-50 indicates that the individual has "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning ...." DSM-IV at 32.

[5]A GAF of 51-60 indicates that the individual has "[m]oderate symptoms ... OR moderate difficulty in social, occupational, or school functioning ...." DSM-IV at 32.

-7-

was helping. (R. at 238.) On January 12, 2004, Talley confronted Ward about a report that she received about him drinking in public. (R. at 237.) Ward denied that he had consumed alcohol. (R. at 237.) Talley assessed Ward's GAF score at 50. (R. at 237.) On February 23, 2004, Ward continued to report sobriety. (R. at 226.) Talley assessed Ward's GAF score at 58. (R. at 226.) On February 24, 2004, Ward reported that he was out of his medications and that he had been noncompliant. (R. at 225.) On March 22, 2004, Debbie Moore, B.S., reported that Ward's mood appeared somewhat anxious. (R. at 217.) Ward denied alcohol consumption. (R. at 217.) On June 30, 2004, Ward reported that his medication was helping his symptoms of anxiety. (R. at 368.) On July 30, 2004, Ward reported that his medication was helping his symptoms of anxiety. (R. at 366.) On August 25, 2004, Ward reported feeling well and that his medications had been helpful. (R. at 364.) It was reported that Ward showed no evidence of psychosis, cognitive impairment or adverse effects of medication. (R. at 364.) Ward's prescription for Vistaril was changed to be used on an as-needed basis. (R. at 364.) On December 17, 2004, Ward reported anxiety. (R. at 436.) Ward reported that he had not consumed alcoholic beverages, however, Dr. Pitone reported that he had detected an odor suggesting that Ward may have had a relapse. (R. at 436.) Dr. Pitone reported that Ward's psychomotor activity was normal. (R. at 436.) Ward's mood was mildly to moderately anxious and mildly to moderately depressed. (R. at 436.) On March 4, 2005, Ward reported that he had relapsed with alcohol for a brief period. (R. at 430.)

On October 21, 2002, Ward presented to the emergency room at Norton Community Hospital for complaints of left shoulder pain. (R. at 293-97.) X-rays of Ward's left shoulder showed ossification of the inferior aspect of the clavicle and a

slight depression at the lateral margin of the humeral head. (R. at 297.) Ward was diagnosed with contusion to the left shoulder. (R. at 294.) On June 29, 2003, Ward presented to the emergency room for complaints of back pain. (R. at 310-13.) He stated that he had slipped and fallen, hitting his right flank area on a step. (R. at 312.) X-rays of Ward's lumbar spine showed degenerative change without definite acute abnormality. (R. at 362.) He was diagnosed with acute myofascial strain. (R. at 311.) On September 1, 2003, Ward presented to the emergency room for complaints of chest pain. (R. at 306-09.) Ward stated that he had been in an altercation with three men. (R. at 308.) It was noted that Ward had recently consumed alcohol. (R. at 306.) A chest x-ray showed no evidence of cardiopulmonary disease. (R. at 361.) An x-ray of Ward's sternum showed a fracture. (R. at 360.) He was diagnosed with a fracture to the sternum. (R. at 307.) An x-ray of Ward's lumbar spine taken on August 18, 2004, showed mild degenerative changes. (R. at 358.) An x-ray of Ward's left knee showed mild degenerative change in the medial joint compartment. (R. at 355.) An x-ray of Ward's right knee showed mild degenerative changes and a small foreign body overlying the medial femoral condyle. (R. at 354.)

On January 30, 2004, Dr. Kevin Blackwell, D.O., examined Ward for his complaints of right ankle, right knee, lower back and sternum pain. (R. at 314-20.) Dr. Blackwell reported that Ward did not appear to be in any acute distress. (R. at 315.) Ward did not have labored breathing, and inspiratory and expiratory effort was reported as good. (R. at 316.) Upper and lower joint examination revealed swelling in the right ankle. (R. at 316.) The remainder of his joint examination was unremarkable with no effusions or obvious deformities. (R. at 316.) Upper and lower extremities were normal, as well as fine motor movement skills. (R. at 316.) Straight

leg raising tests were negative. (R. at 316.) An x-ray of Ward's chest showed no acute cardiopulmonary disease and no pleural effusion. (R. at 320.) X-rays of Ward's lumbar spine showed mild degenerative changes. (R. at 321.) X-rays of Ward's right ankle showed mild arthritic changes at the ankle joint with the alignment of the bones at the ankle joint being normal. (R. at 322.) Dr. Blackwell diagnosed chronic low back pain, right ankle pain, right knee pain, anxiety and depression. (R. at 316.) Dr. Blackwell reported that Ward should avoid squatting, kneeling and crawling. (R. at 316.) Dr. Blackwell reported that Ward was capable of standing six hours in an eight-hour workday and sitting for eight hours in an eight-hour workday assuming normal positional changes. (R. at 316.) He reported that Ward could occasionally lift items weighing up to 50 pounds and frequently lift items weighing up to 25 pounds. (R. at 316-17.) Dr. Blackwell noted no limitation or impairments pertaining to Ward's hands. (R. at 317.)

On February 12, 2004, R. J. Milan Jr., Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), indicating that Ward suffered from a nonsevere substance addiction disorder. (R. at 323-38.) Milan reported that Ward had no limitation on his activities of daily living. (R. at 333.) He reported that Ward had mild difficulties in maintaining social functioning and in maintaining concentration, persistence or pace and had experienced no episodes of decompensation. (R. at 333.) This assessment was affirmed by Julie Jennings, Ph.D., another state agency psychologist, on July 26, 2004. (R. at 323.)

On February 12, 2004, Dr. Frank M. Johnson, M.D., a state agency physician, reported that Ward had the residual functional capacity to perform medium work. (R.

at 339-47.) Dr. Johnson reported that Ward's ability to push and/or pull with his lower extremities was limited. (R. at 340.) Dr. Johnson reported that Ward could occasionally climb ramps, stairs and ladders, balance, stoop, kneel, crouch and crawl, but never climb ropes and scaffolds. (R. at 343.) He also indicated that Ward's ability to reach was limited in his left shoulder. (R. at 343.) No visual, communicative or environmental limitations were noted. (R. at 344-45.) This assessment was affirmed by Dr. Randall Hays, M.D., another state agency physician, on July 23, 2004. (R. at 347.)

On August 18, 2004, Ward saw Dr. Jill Couch, D.O., for complaints of right knee and ankle pain, left shoulder pain and low back pain. (R. at 393.) X-rays of Ward's lumbar spine showed mild degenerative changes. (R. at 387.) X-rays of Ward's knees showed mild degenerative changes. (R. at 387.) X-rays of Ward's left shoulder showed degenerative changes in the greater tuberosity and some mild deformities along the lateral femoral head. (R. at 387.) Dr. Couch reported that Ward's mood and affect were normal. (R. at 390.) Ward was unable to raise his shoulder above his head. (R. at 390.) Ward had muscle spasm in his low back. (R. at 390.) Ward was diagnosed with hypertension, right and left knee pain, right ankle pain, left shoulder pain and low back pain, anxiety and depression. (R. at 390.) In January 2005, Ward was diagnosed with Hepatitis C. (R. at 378-80, 400-02.) Ward complained of anxiety and depression. (R. at 378.) There is no indication that Dr. Couch placed any limitations on Ward's work-related abilities.

The record indicates that Ward was admitted to The Laurels for detoxification services on February 24, 2005. (R. at 422, 427-28.) It was reported in March 2005 that

-11-

Ward did not appear willing to make lifestyle changes necessary to attain sobriety. (R. at 424.) Ward was discharged on March 3, 2005. (R. at 422.)

On April 12, 2005, B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist, evaluated Ward at the request of Ward's attorney. (R. at 409-18.) The Wechsler Adult Intelligence Scale-III, ("WAIS-III"), test was administered, and Ward obtained a verbal IQ score of 69, a performance IQ score of 65 and a full-scale IQ score of 65, placing him in the extremely low range of intellectual functioning. (R. at 410, 414.) Lanthorn also administered the Minnesota Multiphasic Personality Inventory-Second Edition, ("MMPI-2"), revealing a possible tendency to magnify symptoms. (R. at 415.) Lanthorn diagnosed alcohol dependence, in early full remission, an anxiety disorder with both panic attacks and generalized anxiety due to on going chronic physical conditions, a mood disorder with major depressive-like episode, mild mental retardation and a personality disorder, not otherwise specified. (R. at 417.) Lanthorn assessed Ward's GAF score at 40-45.[6] (R. at 417.)

Lanthorn also completed a mental assessment indicating that Ward had a seriously limited, but not precluded, ability to follow work rules, to function independently, to understand, remember and carry out simple job instructions and to maintain personal appearance. (R. at 419-21.) Lanthorn indicated that Ward had no useful ability in the remaining areas of occupational, performance and social adjustments. (R. at 419-20.)

---

[6]A GAF of 31-40 indicates "[s]ome impairment in reality testing or communication ... OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood...." DSM-IV at 32.

-12-

*III. Analysis*

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2006). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920 (2006). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2006).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2006); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining

-13-

whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays,* 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(d), 416.927(d), if he sufficiently explains his rationale and if the record supports his findings.

By decision dated July 21, 2005, the ALJ denied Ward's claims. (R. at 15-23.) The ALJ found that the medical evidence established that Ward had severe impairments, namely musculoskeletal impairments, Hepatitis C, alcohol abuse and possible borderline intellect, but he found that Ward did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 22.) The ALJ found that Ward had the residual

functional capacity to perform simple, unskilled medium work, except food service jobs, that did not require the performance of more than occasional bending, stooping or squatting. (R. at 22.) The ALJ found that Ward could perform his past relevant work. (R. at 22.) Therefore, the ALJ found that Ward was not under a disability as defined in the Act, and that he was not eligible for benefits. (R. at 22-23.) *See* 20 C.F.R. §§ 404.1520(f), 416.920(f) (2006).

In his brief, Ward argues that the ALJ erred by failing to address the medical opinion of Dr. Couch. (Plaintiff's Motion For Summary Judgment And Memorandum Of Law, ("Plaintiff's Brief"), at 7-10.) Ward also argues that the ALJ erred by failing to find that he suffered from a severe mental impairment, absent substance abuse. (Plaintiff's Brief at 10-14.) Ward further argues that the ALJ erred by finding that he did not meet the listing for anxiety disorder found at § 12.06. (Plaintiff's Brief at 14-16.)

Ward does not contest the Commissioner's finding as to his physical residual functional capacity. Nor does he challenge the Commissioner's finding that he could perform his past relevant work, if his residual functional capacity were as found by the Commissioner.

Ward argues that the ALJ erred by failing to address the medical opinion of his treating physician, Dr. Couch. (Plaintiff's Brief at 7-10.) While it is true that a treating physician's opinion is generally given more weight than the opinion of a consultative or nonexamining physician, *see* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2), a treating physician's opinion is not determinative. *See* 20 C.F.R. §§ 404.1527(e), 416.927(e). In particular, an ALJ may reject or discredit a treating physician's opinion if the

-15-

opinion is not well-supported by medically accepted clinical and laboratory diagnostic techniques or is inconsistent with other substantial evidence of record. *See* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). Also, as stated above, an ALJ may assign no or little weight to an opinion from a consultative or nonexamining physician based on the factors set forth at 20 C.F.R. §§ 404.1527(d), 416.927(d), if he sufficiently explains his rationale and if the record supports his findings. Based on my review of the record, I find this argument is without merit.

Although the ALJ did not mention Dr. Couch by name, the ALJ discussed Dr. Couch's medical findings. Specifically, he discussed the diagnostic testing related to Ward's treatment by Dr. Couch for knee and back pain, noting that this testing showed only mild degenerative changes. (R. at 19, 354, 385, 399.) The ALJ also discussed Dr. Couch's diagnosis of Hepatitis C and the lack of limitations resulting from this condition. (R. at 19, 378-79.) While the ALJ did not discuss Dr. Couch's diagnosis of anxiety and depression, it is noted that Dr. Couch was Ward's family physician and was primarily concerned with treating his physical problems. Dr. Couch acknowledged that she was not Ward's main source of treatment for his psychological concerns by referring him back to Dr. Pitone, Ward's treating psychiatrist, and Eric Greene, Ward's substance abuse counselor. (R. at 379.) The ALJ thoroughly discussed Ward's psychiatric treatment and alcohol rehabilitation counseling in the body of his decision. (R. at 18-20.) Furthermore, the record contains no opinion from Dr. Couch regarding Ward's ability to perform substantial gainful activity.

Ward next argues that the ALJ erred in finding that, absent alcohol abuse, there

-16-

was no evidence indicating that he would have any mental based limitations.[7] (Plaintiff's Brief at 10-14.) Based on my review of the record, I find that substantial evidence exists to support the ALJ's finding on this issue. Medical expert Schacht testified that when Ward was sober, his mental status was "really pretty good." (R. at 500.) Schacht's opinion was based on the finding of Dr. Pitone. In August 2004, during a period of sobriety, Dr. Pitone reported that Ward's speech and psychomotor activity was normal. (R. at 364.) Ward's behavior was normal, he was well-groomed and his mood was euthymic with only mild anxiety. (R. at 364.) Ward's affect was appropriate with good range, and he showed no evidence of psychosis or cognitive impairment. (R. at 364.) In September 2004, while Ward maintained sobriety, his counselor noted that he appeared to be meeting more of his own needs in relation to his health care, his mood appeared to be euthymic and his affect showed excellent range. (R. at 440.) In addition, state agency psychologist Milan found that Ward suffered from a substance addiction disorder. (R. at 323-38.) He also found that Ward had no limitation in is activities of daily living. (R. at 333.) Milan also reported that Ward had only mild difficulties in maintaining social functioning and in maintaining concentration, persistence or pace. (R. at 333.) Furthermore, Ward reported on several occasions that his medication was helping his anxiety symptoms. (R. at 238, 364, 366, 368.) "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986).

---

[7] In 1996, Congress amended the Social Security Act to provide that "[a]n individual shall not be considered to be disabled for the purposes of this subchapter if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C.A. §1382c(a)(3)(J) (West 2003). These amendments specified that they were to "apply to any individual who applies for, or whose claim is finally adjudicated with respect to, supplemental security income benefits ... on or after the date of the enactment of this Act [March 29, 1996]." Pub. L. No. 104-121, §105(b)(5)(A) (amending 42 U.S.C. § 1382 notes), 110 Stat. 847, 853-54.

Case 2:05-cv-00060-PMS   Document 17   Filed 10/02/06   Page 17 of 20   Pageid#: 105

Ward's periods of depression all seemed to be related to his abuse of alcohol. On December 17, 2004, Dr. Pitone noted that Ward smelled of alcohol, suggesting a relapse. (R. at 436.) On that date, Ward reported depression and mood instability. (R. at 436.) Schacht opined that Ward's possible borderline intellectual functioning also was related to his history of alcohol consumption, noting Ward's high IQ scores on tests that he had taken during his childhood. (R. at 128, 499-500.) The ALJ found that Lanthorn's findings were not entitled to much weight because Lanthorn clearly failed to recognize the seriousness of Ward's alcohol abuse. (R. at 19, 409-21.) Lanthorn's finding of mild mental retardation was contradicted by Ward's school records, and Lanthorn's other conclusions were questionable due to Ward's possible symptom magnification as identified by the MMPI-2 testing. (R. at 124-31, 409-21.) Although the objective medical evidence did not indicate that Ward had any significant mental impairments when sober, the ALJ accommodated any potential psychological difficulties by restricting him to simple, unskilled work. (R. at 22.)

Based on my findings above, I also reject Ward's argument that the ALJ erred by finding that his anxiety did not meet or equal a listed impairment. (Plaintiff's Brief 14-16.) To meet or equal the listed impairment for anxiety related disorders found at § 12.06, a claimant must show by medically documented findings that he suffers from at least one of the following:

1. Generalized persistent anxiety accompanied by three of the following: motor tension, autonomic hyperactivity, apprehensive expectation or vigilance and scanning;
2. A persistent irrational fear of a specific object, activity or situation which results in a compelling desire to avoid the dreaded object, activity or situation;
3. Recurrent severe panic attacks manifested by a sudden

>           unpredictable onset of intense apprehension, fear, terror and
>           sense of impending doom occurring on the average of at least
>           once a week;
>    4.    Recurrent obsessions or compulsions which are a source of
>           marked distress; or
>    5.    Recurrent and intrusive recollections of a traumatic experience,
>           which are a source of marked distress.

*See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.06(A) (2006). A claimant also must show that his condition results in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; deficiencies of concentration, persistence or pace resulting in frequent failure to complete tasks in a timely manner; or repeated episodes of deterioration or decompensation in work or work-like settings which cause the individual to withdraw from that situation or to experience exacerbation of signs and symptoms. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.06(B) (2006). If a claimant cannot show that his condition resulted in two of the previous problems, he still may qualify for benefits under this section if he can show that his symptoms have resulted in a complete inability to function independently outside the area of his home. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.06(C) (2006). The record contains no evidence from any psychological or psychiatric expert stating that Ward's anxiety met these criteria. Again, the only evidence addressing this issue is from the state agency psychologists who found that Ward's condition did not meet or equal a listed impairment. Therefore, I find that substantial evidence supports the ALJ's finding that Ward's condition did not meet or equal the requirements of § 12.06.

Case 2:05-cv-00060-PMS   Document 17   Filed 10/02/06   Page 19 of 20   Pageid#: 107

## IV. Conclusion

For the foregoing reasons, Ward's motion for summary judgment will be denied, the Commissioner's motion for summary judgment will be granted and the Commissioner's decision denying benefits will be affirmed.

An appropriate order will be entered.

DATED: This 2nd day of October 2006.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE